UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BMO HARRIS BANK, N.A. and SUN CAPITAL PARTNERS, VI, L.P., | ) ) ) | |
| *Appellants*, | ) ) | No. 1:22-cv-01742-JMS-MKK |
| v. | ) ) ) | |
| JOHN J. PETR, *Trustee for BWGS, LLC*, | ) ) | |
| *Appellee.* | ) | |

## ORDER ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT

In March 2019, creditors filed an involuntary bankruptcy petition against BWGS, LLC ("BWGS") and the Bankruptcy Court entered an order for relief under Chapter 7 of the Bankruptcy Code. Subsequently, John J. Petr, the Trustee for BWGS ("the Trustee"), filed an adversary proceeding against Appellants BMO Harris Bank, N.A. ("BMO") and Sun Capital Partners, VI, L.P. ("Sun Capital"). The Trustee claimed that a transfer of $24,887,303 of BWGS's property to BMO to pay off a bridge loan was a constructively fraudulent transfer. The bridge loan was obtained by BWGS's parent to purchase all of BWGS's stock, and was guaranteed by Sun Capital. BMO and Sun Capital moved to dismiss the Trustee's Amended Complaint in the adversary proceeding, the Bankruptcy Court denied the Motions to Dismiss, and this Court granted BMO and Sun Capital's Motion for Leave to Appeal that decision to this Court. This Order resolves the appeal.[1]

---

[1] BMO and Sun Capital also filed a Request for Oral Argument. [Filing No. 32.] Because the parties' briefs afforded the Court an adequate basis on which to rule on the appeal without the assistance of oral argument, the Court **DENIES** the Request for Oral Argument. [Filing No. 32.]

# I.
## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 158(a)(3), this Court has jurisdiction to hear appeals from interlocutory orders of the Bankruptcy Court, with leave of court.  When reviewing a Bankruptcy Court's decision, questions of law—such as questions of statutory interpretation—are reviewed *de novo*. *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 776 (7th Cir. 2013).  When an issue presents both issues of law and fact, it is also reviewed *de novo*. *Grede v. FCStone, LLC*, 746 F.3d 244, 251 (7th Cir. 2014).

# II.
## BACKGROUND[2]

### A.    Sun Capital Acquires BWGS

BWGS initially was formed as an Indiana corporation called Worm's Way, Inc. ("Worm's Way") on March 6, 1987.  [R. 68.]  For the next thirty-plus years, Worm's Way sold unique garden products and distributed wholesale organic and hydroponic garden products which allowed plants, including vegetables, to grow without soil.  [R. 68.]  In 2015, BWGS began experiencing a downward trend in its gross profit margin, and it began incurring millions in net losses in 2016.  [R. 69.]

After this downward trend began, BWGS became an acquisition target of Sun Capital.  [R. 63, 69.]  At that time, all of BWGS's outstanding stock was held in an Employee Stock Ownership Plan Trust ("ESOP Trust").   [R. 70.]   By late 2016, BWGS Intermediate Holding, LLC

---

[2] The Court's citations to "R. __" refer to the Bankruptcy Court record at Filing Nos. 27 and 27-1 through 27-4.  Additionally, the parties cite extensively to the Trustee's Amended Complaint to Avoid and Recover Fraudulent Transfer, filed in the adversary proceeding before the Bankruptcy Court.  [Filing No. 27 at 62-93.]  The Court accepts these background allegations as true for purposes of this appeal.

("Intermediate Holding"), an affiliate of Sun Capital, entered into a stock purchase agreement ("the Stock Purchase Agreement") to acquire all of BWGS's stock from the ESOP Trust.  [R. 63, 70.]

### B.   Intermediate Holding Obtains a Bridge Loan From BMO

In order to fund a portion of the stock purchase, Intermediate Holding and BMO entered into an agreement on December 30, 2016 whereby BMO provided a bridge loan to Intermediate Holding for $25.8 million ("the Bridge Loan").  [R. 63-64.]  Sun Capital or one of its affiliates either guaranteed the Bridge Loan or was otherwise obligated to ensure that the Bridge Loan was repaid ("the Sun Capital Guaranty").  [R. 64.]  The Sun Capital Guaranty was a credit enhancement to BMO with respect to the Bridge Loan.  [R. 71, 91.]  In order to comply with the Stock Purchase Agreement, BMO transferred the $25.8 million in proceeds from the Bridge Loan directly to the ESOP Trust on December 30, 2016, and Intermediate Holding executed and delivered to BMO a demand note in the principal amount of $25.8 million, which evidenced Intermediate Holding's obligation to repay the Bridge Loan.  [R. 71.]  The Stock Purchase Agreement closed on December 30, 2016 and Intermediate Holding paid approximately $37.75 million total ("the Purchase Price") pursuant to the Stock Purchase Agreement.  [R. 63, 70.]

### C.   The Bridge Loan Is Paid Off

On January 27, 2017, shortly after the Stock Purchase Agreement closed, Sun Capital and other guarantor entities caused BWGS and Intermediate Holding to enter into two credit agreements in order to pay off the Bridge Loan:  (1) a Term Loan Credit Agreement whereby the lenders would make a $20 million term loan to BWGS and Intermediate Holding as co-borrowers, and LBC Credit Agency Services, LLC ("LBC") would act as administrative agent; and (2) a Revolving Loan Credit Agreement whereby the lenders would make loans of up to $20 million to BWGS and Intermediate Holding as co-borrowers, and JPMorgan Chase Bank ("JPMorgan")

would act as administrative agent. [R. 72-73.] As a co-borrower, BWGS gave LBC and JPMorgan security interests in substantially all of its assets. [R. 73.]

Also on January 27, 2017, a total of $25,887,303 was transferred to BMO in full payment of the Bridge Loan. [R. 75.] $1 million of that amount was funded by equity investments made by either LBC or the lenders under the Term Loan Credit Agreement. [R. 75.] BWGS paid off the remaining sum of the Bridge Loan by transferring $24,887,303 of its property to BMO on January 27, 2017 ("the Transfer"). [R. 65, 74-75.] The Transfer had three components: (1) LBC transferred $19,477,597 in "net Term Loan proceeds" directly to BMO pursuant to the Term Loan Credit Agreement; (2) JPMorgan transferred $5 million directly to BMO in connection with the Revolving Loan Credit Agreement; and (3) BWGS transferred $409,706 to BMO from cash on hand. [R. 74-75.] The Trustee contends that the Transfer relieved Sun Capital and the guarantor entities of their "credit enhancement commitments" in connection with the Bridge Loan, so those entities benefitted from the Transfer. [R. 91.]

### D.    BWGS's Performance Continues to Decline

Throughout 2017, BWGS's sales were trending well below historical levels. [R. 84-85.] By December 2017, BWGS was in default on its credit agreements, and it defaulted on other obligations through May 2018. [R. 85.] On May 23, 2018, BWGS executed amendments to the Term Loan Credit Agreement and the Revolving Loan Credit Agreement, and Sun Capital was required to infuse $3 million into BWGS to reduce the outstanding principal owed under the Term Loan Credit Agreement. [R. 86.] Less than a month later, BWGS was in default again, and on March 13, 2019, three of BWGS's creditors filed an involuntary petition under Chapter 7 of the Bankruptcy Code against BWGS. [R. 67, 87-88.] The Bankruptcy Court entered an order for relief under Chapter 7 on April 24, 2019. [R. 88.]

4

E.      **The Trustee's Lawsuit**

On January 19, 2021, the Trustee filed the underlying adversary proceeding against BMO, and on April 23, 2021 it filed an Amended Complaint adding Sun Capital (and the other unknown entities) as defendants.  [R. 11-39, 62-93.]  The Trustee seeks to avoid the Transfer pursuant to § 544(b) of the Bankruptcy Code and §§ 14(a)(2)[3], 17(a), and 18(b)(1) of the Indiana Uniform Voidable Transactions Act ("IUVTA") and to recover the amount of the Transfer from either BMO or Sun Capital pursuant to § 550(a) of the Bankruptcy Code.  [R. 88-91.]

On June 4, 2021, BMO and Sun Capital separately moved to dismiss the Trustee's Amended Complaint based on Bankruptcy Code § 546(e)'s safe harbor, arguing that the Trustee cannot avoid the Transfer because it was made in connection with several securities contracts including the Stock Purchase Agreement, the Bridge Loan, and the Sun Capital Guaranty.  [R. 94-115, 117-139.]  BMO and Sun Capital also argued that any state law claims were preempted by § 546(e).  [R. 108, 132.]

The Trustee opposed the Motions to Dismiss, arguing that § 546(e)'s safe harbor provision only applies to transactions "that implicate systemic risks in the national clearance and settlement system for trades of publicly-held securities."  [R. 147.]

On August 18, 2022, the Bankruptcy Court denied BMO's and Sun Capital's Motions to Dismiss and found that: (1) the Trustee could circumvent § 546(e)'s safe harbor pursuant to his "strong-arm" powers under § 544 by pleading state-law claims under the IUVTA; and (2) § 546(e)'s safe harbor did not apply because the Transfer was not made in connection with a

---

[3] The Trustee refers to § "14(2)" of the IUVTA in the Amended Complaint, [*see, e.g.*, R. 88], but no such provision exists.  The Court assumes this is a typographical error and that he intended to refer to § 14(a)(2).

securities contract since it did not implicate publicly held securities.  [R. 559-84.]  This appeal followed.

### III.
#### DISCUSSION

BMO and Sun Capital raise the following issues on appeal: (1) "[d]id the Bankruptcy Court err in determining that a plaintiff can avoid the application of the safe harbor set out in 11 U.S.C. § 546(e) merely by asserting a state law claim under IUVTA?"; (2) "[d]id the Bankruptcy Court err by looking to legislative history, rather than the express and unambiguous language of 11 U.S.C. § 546(e), to hold that the safe harbor does not apply when the underlying transfer is made 'in connection with' the sale of private, as opposed to publicly traded, securities?"; and (3) "[d]id the Bankruptcy Court err by holding that the underlying Transfer that the Trustee seeks to avoid was not made 'in connection with' a securities contract?"[4]  [Filing No. 29 at 12-13.]  The Court re-orders and re-phrases these issues and discusses them below.

### A.   Whether the Bankruptcy Court Erred by Finding That the Transfer Did Not Fall Within § 546(e)'s Safe Harbor Provision In the First Instance

Section 546(e) provides, in relevant part:

Notwithstanding section[ ] 544…of this title, the trustee may not avoid a transfer that is….a transfer made by or to (or for the benefit of) a…financial institution…in connection with a securities contract, as defined in section 741(7)…that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

---

[4] The Trustee adds the following issue for this Court to determine on appeal: "Even if the…§ 546(e) safe harbor precludes the Trustee from avoiding [the Transfer], may the Trustee obtain judgment against Sun Capital for the value of the Transfer by exercising his rights and powers under 11 U.S.C. § 544(a) and applicable state fraudulent-transfer law, without the necessity of avoiding the Transfer?" [Filing No. 30 at 11.]  As discussed more fully below, because the Trustee did not assert a claim under § 544(a) in the Amended Complaint in the adversary proceeding and did not rely on § 544(a) in opposition to BMO's and Sun Capital's Motions to Dismiss, and since the Bankruptcy Court did not consider such a claim or argument, the Court will not consider this issue on appeal.

11 U.S.C. § 546(e).

The Bankruptcy Court found that § 546(e)'s safe harbor provision did not apply to the Transfer, first turning to the legislative history and concluding that the Transfer did not implicate the Securities Clearance and Settlement System because it did not "implicate the national System for trades of publicly-held securities or pose a systemic risk to the financial marketplace." [R. 564-67, 578-81.] The Bankruptcy Court went on to find that "[n]othing in the [Stock Purchase Agreement] (or any of the other agreements that [BMO and Sun Capital assert] constitutes a 'securities contract') indicates that the contract was executed or performed 'in connection with' the Transfer," because the Transfer was made one month after the Stock Purchase Agreement closed and the Transfer had "nothing to do with the purchase or sale of any securities or any 'securities contract.'" [R. 569.] It found that "[t]here is not a sufficient material nexus between the [Stock Purchase Agreement] (or any related contract) and the Transfer to bring the 'safe harbor' of § 546(e) into play." [R. 569, 583.]

In support of their appeal, BMO and Sun Capital argue that the Bankruptcy Court erred in finding that the Transfer did not satisfy the elements of § 546(e)'s safe harbor for three reasons: (1) it failed to address whether the Bridge Loan and the Sun Capital Guaranty were qualifying "securities contracts"; (2) it ignored the plain language of § 546(e)'s safe harbor and legal authority addressing the "in connection with" requirement; and (3) it improperly resorted to legislative history to add an additional requirement that the Transfer implicate publicly traded securities. [*See* Filing No. 29 at 34-45.] The Court considers each finding in turn.

### 1. The Bankruptcy Court's "Securities Contract" Findings

BMO and Sun Capital argue that the Bankruptcy Court failed to consider whether the Bridge Loan was a "securities contract" for purposes of § 546(e). They argue that BMO extended

credit to Intermediate Holding so that Intermediate Holding could pay the consideration due for its acquisition of BMO's stock, making the Bridge Loan an independent securities contract itself. [Filing No. 29 at 36.]  BMO and Sun Capital contend that the Trustee admits that the Sun Capital Guaranty was a credit enhancement to BMO with respect to the Bridge Loan, so that transaction was also a securities contract under § 546(e).  [Filing No. 29 at 36.]  They argue that "[b]y refusing to consider the other agreements at issue in the leveraged buyout, the Bankruptcy Court committed reversible error."  [Filing No. 29 at 36-37.]

In response, the Trustee argues that the Bankruptcy Court erred in finding that the Stock Purchase Agreement was a securities contract for purposes of § 546(e) because the stock was privately held and did not implicate the Securities Clearance and Settlement System.  [Filing No. 30 at 34.]  He argues further that the Bridge Loan was not a securities contract because the definition of "securities contract" in § 741(7)(A)(v) of the Bankruptcy Code "should be read to apply to extensions of credit to facilitate the clearance and settlement of trades in the Securities Clearance and Settlement System, not to one-off extensions of credit that do not implicate that system, such as the extension of credit in this case."  [Filing No. 30 at 37.]  The Trustee further contends that the Sun Capital Guaranty is not a securities contract because it "did not provide credit enhancement related to a securities contract or a transaction referred to in section 741(7)(A)." [Filing No. 30 at 39.]

In their reply, BMO and Sun Capital argue that the Stock Purchase Agreement, the Bridge Loan, and the Sun Capital Guaranty all meet the literal definition of a "securities contract." [Filing No. 31 at 25.]

The Court agrees with BMO and Sun Capital that the Bankruptcy Court only discussed whether the Stock Purchase Agreement was a "securities contract" for purposes of §546(e)'s safe

harbor, and that it should have also considered whether the Bridge Loan and the Sun Capital Guaranty were securities contracts.  Because it did not determine whether the Bridge Loan and the Sun Capital Guaranty were "securities contracts," its analysis of whether the Transfer was made in connection with a securities contract was incomplete.

Section 546(e) specifically cross-references § 741(7) for the definition of "securities contract."  11 U.S.C. § 741(7) defines "securities contract" as, among other things:

- "a contract for the purchase, sale, or loan of a security";

- "any extension of credit for the clearance or settlement of securities transactions";

- "any…credit enhancement related to any agreement or transaction referred to in this subparagraph, including any guarantee or reimbursement obligation by or to a…financial institution…in connection with any agreement or transaction referred to in this subparagraph";

- "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph"; or

- "any combination of the agreements or transactions referred to in this subparagraph."

"Security" is defined in a general definitions section of the Bankruptcy Code as, among other things, "stock."  11 U.S.C. § 101(49).

Based on the plain and unambiguous language of § 546(e), the Stock Purchase Agreement, the Bridge Loan, and the Sun Capital Guaranty all fall within the definition of "securities contract" as defined by § 741(7).  First, the Stock Purchase Agreement was, based on the Trustee's own allegations, the transaction by which Intermediate Holding acquired the stock of BWGS.  [R. 70.]  The Stock Purchase Agreement constituted "a contract for the purchase…of a security."  11 U.S.C. §741(7)(A)(i).  Second, the Bridge Loan, based on the Trustee's own allegations, was made by BMO to Intermediate Holding "[t]o provide a portion of the $37,751,632 due the ESOP Trust at

closing [of the Stock Purchase Agreement]."  [R. 70.]  The Bridge Loan was an "extension of credit for the clearance or settlement of [a] securities transaction[ ]," or an "agreement…that is similar to an agreement or transaction" referred to in § 741(7).  11 U.S.C. § 741(7)(A)(v) and (vii).  Finally, the Sun Capital Guaranty, again based on the Trustee's own allegations, involved Sun Capital "providing credit enhancement in some manner to [BMO] with respect to the Bridge Loan."  [R. 71.]  Accordingly, it was an "arrangement or other credit enhancement related to any agreement or transaction referred to in [§ 741(7)], including any guarantee…to a…financial institution…in connection with any agreement or transaction referred to in [§ 741(7)]."  11 U.S.C. § 741(7)(A)(xi).

In sum, while the Bankruptcy Court correctly found the Stock Purchase Agreement to be a securities contract within the meaning of § 546(e), it erred in failing to consider whether the Bridge Loan and the Sun Capital Guaranty were also securities contracts.  Based on the definition of "securities contract" in § 741(7), the three transactions – the Stock Purchase Agreement, the Bridge Loan, and the Sun Capital Guaranty – were all "securities contracts."

### 2.    The Bankruptcy Court's "In Connection With" Findings

BMO and Sun Capital argue that under the plain meaning of "in connection with," the Transfer only had to be "related to" a securities contract, that there is no temporal requirement or requirement that the Transfer and the securities contract refer specifically to each other, and that the Bankruptcy Court ignored legal authority that BMO and Sun Capital relied upon.  [Filing No. 29 at 38-39.]

The Trustee responds that the Transfer was not made in connection with the Stock Purchase Agreement because the Transfer paid off the Bridge Loan, and the Loan Authorization Agreement under which the Bridge Loan was made is a separate and distinct agreement from the Stock Purchase Agreement.  [Filing No. 30 at 35.]  The Trustee notes that a case relied upon by BMO

and Sun Capital – *In re Lehman Brothers* – involved public securities so does not apply to the Bridge Loan or the Transfer.  [Filing No. 30 at 36-37.]  He argues that even if the Sun Capital Guaranty was a securities contract, the Transfer was not made in connection with the Sun Capital Guaranty because BMO was not a party to the Sun Capital Guaranty or even an obligor.  [Filing No. 30 at 39.]

BMO and Sun Capital assert in their reply that it is irrelevant that the Transfer on the one hand and the Stock Purchase Agreement, Bridge Loan, and Sun Capital Guaranty on the other are temporally separate from one another and do not specifically reference one another, that the Amended Complaint in the adversary proceeding alleges that the transactions are related, and that there is no requirement that BMO must be a party to either the Bridge Loan or the Sun Capital Guaranty.  [Filing No. 31 at 26.]

"It is proper to construe the phrase 'in connection with' [as used in § 546(e)] broadly to mean 'related to.'"  *In re Lehman Bros. Holdings, Inc.*, 469 B.R. 415, 442 (S.D. N.Y. 2012).[5] Additionally, the "in connection with" requirement of § 546(e) "does not contain any temporal or existential requirement that a transfer must be 'in connection with' then-outstanding legal exposure."  *Id.*  Rather, "[t]he formulation is quite simple: a transfer is safe-harbored if it is 'in connection with' a securities contract.  And the words 'in connection with' are to be interpreted liberally."  *Id.*

The Bankruptcy Court incorrectly stated that neither party had cited authority interpreting "in connection with," disregarding BMO's and Sun Capital's references to *In re Lehman Brothers*

---

[5] The Trustee argues that *In re Lehman Brothers* is inapposite because it involved transactions that implicated publicly held securities.  [Filing No. 30 at 36-37.]  But the court in that case did not draw a distinction between publicly or privately held securities, nor did it base its decision on the fact that publicly held securities were implicated.  This Court finds that factual difference inconsequential in analyzing the "in connection with" requirement.

and another case, *In re Lancelot Investors Fund, L.P.*, 467 B.R. 643 (N.D. Ill. 2012), which both

dealt specifically with the meaning of that phrase as used in § 546 – the former case focusing on §

546(e) and the latter on § 546(g).  Instead, the Bankruptcy Court relied upon a Supreme Court case

that interpreted the phrase "in connection with" in the context of another federal statute outside of

the bankruptcy arena.  [*See* R. 568-69, 582-83 (citing and discussing *Chadbourne & Parke LLP v.

Troice*, 571 U.S. 377 (2014)).]  The Bankruptcy Court concluded that, based on *Chadbourne*,

courts "have to consider the statutory scheme and purpose in which the statute and phrase are

found" in undertaking the "in connection with" analysis.  [R. 568-69, 582-83.]  The Bankruptcy

Court based its decision that the Transfer was not related to the Stock Purchase Agreement in part

on the fact that the two transactions took place a month apart.  [R. 569, 583.]

Although it does not appear that the Seventh Circuit Court of Appeals has considered the

meaning of "in connection with" for purposes of § 546(e)'s safe harbor, at least one district court

within the Seventh Circuit has, finding that "in connection with" should be interpreted broadly and

given a meaning similar to "related to."  *In re MCK Millennium Centre Parking, LLC*, 2015 WL

1906135, at *11 (N.D. Ill. April 24, 2015), *vacated on other grounds*, 2015 WL 13817636 (N.D.

Ill. Sept. 10, 2015).  The Court finds *In re Lehman Brothers*, *In re Lancelot Investors Fund*, and

*In re MCK Millennium Centre Parking* – which all dealt with the "in connection with" requirement

in the context of § 546 – to be more instructive than *Chadbourne*, in which the Supreme Court

interpreted that phrase as it appeared in the Securities Litigation Uniform Standards Act of 1998.

That law prohibits a private party from bringing a securities class action where the party alleges

"a misrepresentation or omission of a material fact in connection with the purchase or sale of a

covered security," 15 U.S.C. § 78bb(f)(1).  The courts in *In re Lehman Brothers*, *In re Lancelot

Investors Fund*, and *In re MCK Millennium Centre Parking* did not impose a temporal requirement

in order for a transfer to have been made in connection with a securities contract, and also did not impose a requirement that the transfer refer specifically to the securities contract. The Bankruptcy Court erred in imposing both the temporal and the specificity conditions to § 546(e)'s "in connection with" requirement.

Here, the Transfer was made in connection with the Stock Purchase Agreement because it was made to pay off the Bridge Loan that was used to close the Stock Purchase Agreement. Further, the Transfer was made in connection with the Bridge Loan because it was used to pay off the Bridge Loan. Additionally, the Transfer was made in connection with the Sun Capital Guaranty because Sun Capital gave credit enhancements for the Bridge Loan, which was paid off through the Transfer.

>        3.     *The Bankruptcy Court's Imposition of a Publicly Traded Securities*
>               *Requirement*

BMO and Sun Capital argue that because the language of § 546(e) is unambiguous, the Bankruptcy Court should not have resorted to legislative history and added an extratextual requirement that the securities contract at issue needed to implicate the public Securities Clearance and Settlement System. [Filing No. 29 at 42.] BMO and Sun Capital assert that, in any event, finding that the safe harbor applies to the Transfer would not frustrate the legislative intent, stating "[t]o the contrary, numerous circuit courts of appeal have repeatedly acknowledged that unwinding transfers of funds to financial institutions tied to private leveraged buyout transactions, like the one at issue here, are covered by the safe harbor because they are still capable of destabilizing financial markets." [Filing No. 29 at 44.] BMO and Sun Capital point to numerous circuit courts that have refused to impose a public securities requirement in order for the safe harbor to apply. [Filing No. 29 at 45.]

In response, the Trustee traces the legislative history of § 546(e) and argues that the legislation that ultimately evolved into § 546(e) was enacted in response to a Southern District of New York case "which opened the door to avoidance liability for commodities clearing associations, creating the risk that a large bankruptcy could destabilize markets." [Filing No. 30 at 21 (discussing *Seligson v. New York Produce Exchange*, 394 F. Supp. 125 (S.D. N.Y. 1975)).] The Trustee asserts that amendments to the legislation in 1982 and 2006 were "to protect financial intermediaries in the Securities Clearance and Settlement System" and that, consistent with that purpose, some courts have refused to apply § 546(e)'s safe harbor to shield transfers that do not implicate publicly traded securities. [Filing No. 30 at 23-29.] He contends that the Court should look to the legislative history of § 546(e) because it is ambiguous due to the fact that definitional cross-references in § 546(e) appear in subchapters which govern "stockbroker liquidations" and "commodity broker liquidations." [Filing No. 30 at 30-31.] The Trustee argues further that the legislative history is relevant because a literal reading of § 546(e) could "lead to absurd results contrary to congressional intent." [Filing No. 30 at 31.] He argues that the Stock Purchase Agreement, the Bridge Loan, and the Sun Capital Guaranty are not "securities contracts" within the meaning of § 546(e) because none involved the securities markets or publicly traded securities. [Filing No. 30 at 33-39.]

BMO and Sun Capital argue in their reply that § 546(e) is unambiguous because § 741(7) defines "securities contract" broadly, 11 U.S.C. § 101(49)(A)(ii) defines "security" to include "stock," and neither definition includes a requirement that the security must be publicly traded. [Filing No. 31 at 11.] They assert that if Congress had wanted to limit the application of § 546(e)'s safe harbor to transfers that implicated publicly held securities, it could have expressly done so in the same way that § 546(e) excepts intentionally fraudulent transfers from its application. [Filing

No. 31 at 11.]  BMO and Sun Capital argue that the fact that definitions of terms in § 546(e) are pulled from other sections of the Bankruptcy Code does not create an ambiguity and that the Trustee's absurdity argument fails because such an argument applies to "linguistic, as opposed to substantive, absurdity."  [Filing No. 31 at 13 (quotation and citation omitted).]  BMO and Sun Capital point to cases where courts have applied § 546(e)'s language broadly and have declined to apply additional limitations, and distinguish cases relied upon by the Trustee.  [Filing No. 31 at 14-22.]  Finally, BMO and Sun Capital argue that even if the legislative history of § 546(e) is considered, that history shows that the focus of the 2006 amendments was on "the potential for systemic risk to the financial markets and on broadly protecting against potential ripple effects that could disrupt financial markets if certain transfers involving financial institutions are clawed back as a result of a bankruptcy," and that "courts have repeatedly held that, under the current safe harbor language, unwinding transfers of funds to financial institutions tied to private leveraged buyout transactions, like the one at issue here, are still capable of destabilizing financial markets, and the safe harbor should still apply."  [Filing No. 31 at 23 (quotation omitted).]

At the outset, the Court notes that it is difficult to discern whether the Bankruptcy Court's decision requires the "securities contract" referred to in § 546(e) to involve publicly held securities, or requires the Transfer to be "in connection with" a transaction that implicates publicly held securities.  Perhaps that is a distinction without a difference, but the Bankruptcy Court's discussion is somewhat imprecise on that point.  It appeared to focus on the "securities contract" – *i.e.*, the Stock Purchase Agreement – stating that "the underlying purchase of stock was a private transaction that did not in any sense involve the System that § 546(e) was intended to protect."  [R. 567, 581.]  But it then appeared to focus on whether the Transfer implicated publicly held securities, stating that "courts have no clear mandate in the language of § 546(e) to apply the safe

harbor to shield transfers that do not implicate the Securities Clearance and Settlement System," and "Courts should be particularly reluctant to [apply § 546(e)] where, as here, the transfer under attack does not implicate the national System for trades of publicly-held securities or pose a systemic risk to the financial marketplace."  [R. 567, 581.]  It then stated in a footnote:

> Based on the briefing, it is tempting to focus on the issue of whether a transaction that does not implicate the Securities Clearance and Settlement System for trades of publicly-held securities or pose a systemic risk to the financial marketplace can be protected by the safe harbor….  The parties have noted arguments and law on both sides of the issue of whether a transaction can be "disqualified" from safe harbor protection just because it does not implicate the Securities Clearance and Settlement System.  However, this Court's focus is on the phrase "in connection with".  As such, this Court is not trying to override the clear language of § 546 but rather [is] trying to determine whether such phrase should be stretched to "connect" a transfer of funds with a transaction that occurred nearly a month earlier when the face of the documents do not make such a material connection.  In this light, the Court does not think it wrong to consider the purposes of the statute when interpreting it.

[R. 568, 582.]  This statement seems to suggest that the Bankruptcy Court did not intend to impose a blanket requirement that either the Transfer or the "securities contract" at issue implicate publicly held securities, but rather to look at the transaction as a whole and see if there was a temporal connection between the two.

In any event, while the Bankruptcy Court's decision is somewhat unclear, the Court reads it as using the legislative history of § 546(e) to impose a requirement that the Transfer implicate publicly held securities and finds that doing so was error.  The United States Supreme Court has explained:

> [W]e have repeatedly held [that] the authoritative statement is the statutory text, not the legislative history or any other extrinsic material.  Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.  Not all extrinsic materials are reliable sources of insight into legislative understandings, however, and legislative history in particular is vulnerable to two serious criticisms. First, legislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become…an exercise

16

in "looking over a crowd and picking out your friends."  Second, judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members – or, worse yet, unelected staffers and lobbyists – both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text.

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005); *see also Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1749 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end.  The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration…. Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.") (quotation and citations omitted); *U.S. Venture, Inc. v. United States*, 2 F.4th 1034, 1043 (7th Cir. 2021) ("[O]ur interpretation of the tax credit statute rests entirely on the language employed in [the statute] and the additional cross-referenced statutes and regulations identified in the text.  Finding the statutory language and structure clear, we need not resort to the parties' arguments based on legislative history.")  Further, the Supreme Court has instructed that "we ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997).

Nowhere in § 546(e) is a distinction drawn between a transaction that implicates publicly traded securities versus one that implicates privately held securities.  Instead, as discussed above, § 546(e) refers to the definition of "securities contract" in § 741(7), which similarly does not distinguish between publicly or privately held securities. The fact that the definition of "securities contract" appears in another section of the Bankruptcy Code is of no moment – indeed, statutes frequently refer to other statutes in order to define included terms.

Further, and as noted earlier, the "in connection with" language has been interpreted by numerous courts broadly to mean "related to."  *See, e.g.*, *In re Bernard L. Madoff Inv. Securities*

*LLC*, 773 F.3d 411, 421-22 (2d Cir. 2014) ("In the context of § 546(e), a transfer is 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract," and § 546(e) "sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided."); *In re Lehman Bros. Holdings Inc.*, 469 B.R. at 442 ("It is proper to construe the phrase 'in connection with' broadly to mean 'related to.'").

Moreover, numerous courts have applied § 546(e)'s safe harbor to transactions that did not implicate publicly held securities. *See, e.g.*, *In re QSI Holdings, Inc.*, 571 F.3d 545, 550 (6th Cir. 2009) ("[W]e hold that nothing in the text of § 546(e) precludes its application to settlement payments involving privately held securities."); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 986 (8th Cir. 2009) ("Nothing in the relevant statutory language suggests Congress intended to exclude these payments from the statutory definition of 'settlement payment' [as used in § 546(e)] simply because the stock at issue was privately held."); *In re Taylor, Bean & Whitaker Mortgage Corp.*, 2017 WL 4736682, at *9 (M.D. Fla. Mar. 14, 2017) ("[I]f Congress wanted § 546(e) to apply to only non-private transactions, it has the constitutional authority to rewrite the statute.  The judiciary, however, does not."); *In re Lancelot Investors Fund, L.P.*, 467 B.R. at 655 (§ 546(e) "does not limit its protection to transactions made on public exchanges").  The Bankruptcy Court erred in finding that the Transfer did not fall within § 546(e)'s safe harbor because it did not implicate publicly held securities.  The language of § 546(e) – and the definitions it cross-references and incorporates – is unambiguous and does not include a publicly-held securities requirement.

In sum, the Stock Purchase Agreement, the Bridge Loan, and the Sun Capital Guaranty were "securities contracts," the Transfer was made "in connection with" all three of those transactions, § 546(e) does not require that the Transfer implicate publicly held securities, and the

Bankruptcy Court erred in finding that the Transfer did not fall within § 546(e)'s safe harbor in the first instance.

    **B.**    **Whether the Bankruptcy Court Erred By Finding That the Trustee Could Avoid the Application of § 546(e)'s Safe Harbor Provision By Asserting a IUVTA Claim**

The Bankruptcy Court found that because the Trustee had adequately alleged a claim under the IUVTA, he could avoid the Transfer.  It stated:

> Under the "strong arm" powers of § 544, Trustee stands in the shoes of an unsecured creditor of [BWGS] in seeking to recover from BMO [and Sun Capital] under the [IUVTA].  Under IUVTA § 18(b)(1), Trustee may recover the "value" of the Transfer if the Transfer "is avoidable in an action by a creditor under section 17(a)(1)" of the IUVTA.  IUVTA § 18(b)(1) allows for recovery of the amount of an avoidable transfer from the first transferee of the Transfer.

[R. 564, 577.]  As to the Trustee's claims against BMO, the Bankruptcy Court stated:

> Pursuant to IUVTA §§ 14 and 15, the Transfer is avoidable under IUVTA § 17(a)(1) if (1) [BWGS] made the Transfer without receiving reasonably equivalent value in exchange for the Transfer; and (2) [BWGS's] financial condition met the tests of IUVTA §§ 14(a)(2) or 15(a)(2).  Trustee has adequately pleaded in the Complaint that those elements of avoidability exist as to the Transfer and recovery from BMO.

[R. 564.]  As to the Trustee's claims against Sun Capital, the Bankruptcy Court stated:

> [A]s of the Order for Relief, and pursuant to IUVTA § 18(b)(1), an unsecured creditor of [BWGS] could have sued Sun Capital directly asserting an avoidance action to recover the value of the Transfer without first avoiding the Transfer to BMO.  Trustee may step into such a creditor's shoes and assert the claim against Sun Capital without first avoiding the Transfer to BMO and without triggering the application of § 546(e).

> Therefore, contrary to Sun Capital's position, the critical issue is not whether the Transfer to BMO is shielded from avoidance by the safe harbor in § 546(e), but instead whether the Transfer would be "avoidable" by a creditor under IUVTA § 17(a)(1).  Whether the Transfer is "avoidable" by a creditor under the IUVTA (as opposed to being "avoided" by Trustee under §§ 544 or 550) is not affected by § 546(e).

[R. 577.]

BMO and Sun Capital assert that § 544 only allows a trustee to avoid transfers made by or to financial institutions in connection with securities contracts where there has been intentional fraud, but that the Trustee here only alleges constructive fraud pursuant to § 544(b). [Filing No. 29 at 27.]  BMO and Sun Capital assert that the Trustee only brought claims under federal bankruptcy law in the adversary proceeding and that the Bankruptcy Court "improperly grafted a creditor's state law avoidance and recovery claim onto the Trustee's complaint where none existed" and "created an unpled Indiana constructive fraudulent transfer claim for recovering damages against both BMO and Sun Capital purportedly pursuant to 'the 'strong arm' powers of § 544' and Section 18(b)(1) of IUVTA." [Filing No. 29 at 28 (emphasis omitted, quoting R. 564, 577).]  BMO and Sun Capital contend that Section 18(b)(1) of the IUVTA only creates claims for creditors, and the Trustee is not a creditor, and "a constructive fraudulent conveyance action brought by a trustee on behalf of the creditors under Section 544 is a claim arising under federal law." [Filing No. 29 at 28-29.]  Further, BMO and Sun Capital argue that "Section 544(b) does not allow a trustee to recover anything from anyone under [§] 550(a) without first avoiding the transfer at issue.  Because Section 546(e) stands squarely in the way of avoidance, the claims against BMO should have been dismissed." [Filing No. 29 at 29-30 (emphasis omitted).]  They argue that the Trustee can only maintain a recovery claim under § 550(a) against Sun Capital as the beneficiary of the Transfer if he can first avoid the Transfer to BMO under § 544(b), and that he cannot do so because of § 546(e)'s safe harbor. [Filing No. 29 at 30.]  BMO and Sun Capital note that Congress expressly excluded claims for intentional fraud from the safe harbor, which "strongly implies that it did not want to exclude state law claims brought via Section 544 from the safe harbor." [Filing No. 29 at 31 (emphasis omitted).]  They contend that even if the Trustee could bring a fraudulent transfer claim under the IUVTA by standing in the shoes of the creditors, § 546(e) "impliedly preempts"

such a claim where the relevant transfer falls within the safe harbor, asserting that "there is not a single Circuit Court of Appeals that has held that state law claims are not preempted in this context." [Filing No. 29 at 31-34 (emphasis omitted).]

The Trustee responds that under the IUVTA, a creditor can recover judgment for a transfer that was "avoidable, not actually avoided," and that Section 544(a) of the Bankruptcy Code confers the same rights and powers on the Trustee as those of a hypothetical judgment lien creditor (which constitutes a creditor under the IUVTA). [Filing No. 30 at 41.] He asserts that "[a]ccordingly, if [the] IUVTA grants a creditor the right and power to obtain a Transfer Beneficiary Judgment without avoiding a Transfer, section 544(a) confers that right and power on the Trustee." [Filing No. 30 at 41.] The Trustee then attempts to distinguish caselaw relied upon by BMO and Sun Capital for its argument that § 546(e) preempts the IUVTA, contending that "[its] argument under section 544(a) is limited to claims against entities that are not identified as protected entities under section 546(e) and that are entities for whose benefit a constructively fraudulent transfer was made (i.e., entities such as Sun Capital), not transferees. Only in those limited circumstances will the section 544(a) theory of recovery have any purchase." [Filing No. 30 at 47.]

In their reply, BMO and Sun Capital argue that the Trustee "never pled an IUVTA recovery action under Section 544(a), has never raised this issue before the Bankruptcy Court, nor even previewed this issue in the parties' briefing for BMO and Sun Capital's motion for leave to appeal." [Filing No. 31 at 27.] They note that the Trustee argues that the Bankruptcy Court raised the issue *sua sponte*, but contend that this is not the case. [Filing No. 31 at 27-28.] Additionally, BMO and Sun Capital assert that even if the Trustee could have raised a Section 544(a) claim in the Bankruptcy Court, he cannot raise it on appeal because he did not cross-appeal. [Filing No. 31 at

28.]  BMO and Sun Capital reiterate their argument that, in any event, Section 546(e) preempts any IUVTA claims brought pursuant to Section 544(a).  [Filing No. 31 at 29-31.]

  *1.    Avoidance Under § 544(a)*

11 U.S.C. § 544(a) allows a trustee to "avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by" certain creditors that extend credit to the debtor.  As noted above, in his Amended Complaint the Trustee sought a judgment against BMO for $24,887,303 plus pre-judgment interest under Sections 14(a)(2) and 17(a) of the IUVTA and Sections 544(b) and 550(a) of the Bankruptcy Code and a judgment against Sun Capital in the same amount under Section 18(b)(1) of the IUVTA and Sections 544(b) and 550(a) of the Bankruptcy Code.  [R. 88-91.]  The Trustee did not raise a claim under § 544(a) and may not raise such a claim for the first time in this appeal. *See Crosby v. Kallis*, 2023 WL 1514460, at *2 (7th Cir. Feb. 3, 2023).

Further, the Trustee did not rely on § 544(a) in opposition to the Motions to Dismiss in the adversary proceeding.  As the Supreme Court has explained, "[i]n our adversarial system of adjudication, we follow the principle of party presentation…. [O]ur system is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quotations and citations omitted).  The Trustee cannot raise his § 544(a) argument for the first time on appeal, after failing to do so in opposition to the Motions to Dismiss.  *See Xiong v. Bd. of Regents of Univ. of Wis. System*, 62 F.4th 350, 354 (7th Cir. 2023) ("[A] litigant cannot raise entirely new arguments on appeal."); *In re Sokolik*, 635 F.3d 261, 268 (7th Cir. 2011) ("[W]hen an issue was not raised in the bankruptcy court, a finding

that the issue is waived at the district court level is the correct result, since to find otherwise would permit a litigant simply to bypass the bankruptcy court.") (quotation and citation omitted).

Because the Trustee did not assert a claim under § 544(a) in the Amended Complaint in the adversary proceeding, nor did he rely upon that provision in opposing the Motions to Dismiss, the Court will not consider any arguments under § 544(a) in this appeal.

### 2. Avoidance Under § 544(b)

11 U.S.C. § 544(b) provides, in relevant part, that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."  Once a trustee avoids a transfer under § 544(b), he can recover the property that was transferred from the initial transferee "or the entity for whose benefit such transfer was made," or "any immediate or mediate transferee of such initial transferee" under 11 U.S.C. §550(a).  The Amended Complaint asserts claims under § 544(b) and § 550(a) against BMO and Sun Capital, relying on §§ 14(a)(2) and 17(a) of the IUVTA for recovery against BMO and on § 18(1) of the IUVTA for recovery against Sun Capital.  [R. 88-91.]  Sections 14(a)(2) and 17(a)(1) of the IUVTA allow a creditor to avoid certain transfers.  Ind. Code §§ 32-18-2-14(a)(2) and 32-18-2-17(a).  The Trustee alleges that he can stand in the shoes of various unsecured creditors of BWGS to avoid the Transfer to BMO.  [See R. 90.]  Section 18(b)(1) of the IUVTA allows a creditor to recover judgment for the value of an asset that is avoidable under § 17(a)(1) from a transferee that took the transfer for value.  Ind. Code § 32-18-2-18(b)(1).  The Trustee alleges that he can recover the Transfer from Sun Capital because the Transfer relieved Sun Capital of credit enhancement commitments.  [R. 30.]

The Bankruptcy Court noted that the Trustee stands in the shoes of an unsecured creditor under § 544(b) and that the Trustee relied on the IUVTA to recover the value of the Transfer, stating that "the critical issue is not whether the Transfer to BMO is shielded from avoidance by the safe harbor in § 546(e), but instead whether the Transfer would be 'avoidable' by a creditor under IUVTA § 17(a)(1). Whether the Transfer is 'avoidable' by a creditor under the IUVTA (as opposed to being 'avoided' by [the] Trustee under §§ 544 or 550) is not affected by § 546(e)." [R. 577.] But the Bankruptcy Court ignored the fact that the Trustee's claims against BMO and Sun Capital are explicitly brought under §§ 544(b) and 550(a) of the Bankruptcy Code. Those Bankruptcy Code provisions allow the Trustee to stand in the shoes of an unsecured creditor and, once in those shoes, potentially establish liability under the IUVTA and then recover via § 550(a) of the Bankruptcy Code. Indeed, without § 544(b), the Trustee does not have viable claims under the IUVTA because he is not a creditor – the only entity that can bring claims under the IUVTA sections upon which the Trustee relies. *See* Ind. Code § 32-18-2-14 (titled "Transfers voidable as to present and future creditors" and discussing when a transfer made or obligation incurred by a debtor "is voidable as to a creditor"); Ind. Code § 32-18-2-17 (titled "Remedies of creditors" and discussing when a creditor may obtain avoidance of a transfer or obligation); Ind. Code § 32-18-2-18 (section 18(b)(1) of the IUVTA discussing when "the creditor may recover judgment for the value of the asset transferred").

The Bankruptcy Court disregarded the fact that without § 544, the Trustee would have no claim under the IUVTA. This was a critical error because § 546(e)'s safe harbor specifically states that "[n]otwithstanding section[ ] 544…the trustee may not avoid a transfer that is…a transfer made by or to (or for the benefit of) a… financial institution…in connection with a securities contract." In other words, despite what § 544 may allow the Trustee to do – here, he alleges that

it allows him to recover the Transfer under the IUVTA – he cannot do so if the Transfer falls within § 546(e)'s safe harbor.  As discussed above, the Transfer falls within the plain and unambiguous language of § 546(e), so the Trustee cannot avoid it under § 544(b).

The Court's analysis could end here, but it also finds that even if the Trustee had asserted stand-alone claims under the IUVTA, those claims would be preempted by § 546(e).[6]  While it does not appear that the Seventh Circuit Court of Appeals has considered the preemption issue, other Circuit Courts have found that § 546(e) preempts state law claims.  *See In re Tribune Co. Fraudulent Conveyance Litigation*, 946 F.3d 66, 96 (2d Cir. 2019) (state law fraudulent conveyance claims preempted by § 546(e)); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 988 (8th Cir. 2009), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting*, 138 S. Ct. 883 (2018) (finding state law claims were preempted by § 546(e) and stating "[t]hrough its state law claims, [plaintiff] seeks to recover the same payments we have already held are unavoidable under § 546(e).  Allowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section."); *see also In re Quorum Health Corp.*, 2023 WL 2552399, at *11 (D. Del. Mar. 16, 2023) ("[T]he safe harbor of § 546(e) preempts the Plaintiffs' ability to pursue avoidance claims under state law fraudulent transfer law as assignees of the Senior Noteholders.").

The Bankruptcy Court erred in finding that the Trustee had asserted separate IUVTA claims and, even if he had asserted such claims, they would be preempted by § 546(e).  Instead, the IUVTA claims were premised on the Trustee standing in the shoes of an unsecured creditor under § 544(b) to avoid the Transfer – an avoidance which is specifically prohibited by § 546(e).

---

[6] BMO and Sun Capital raised the preemption issue in their Motions to Dismiss, [R. 108, 132], but the Bankruptcy Court did not discuss preemption in its Orders denying the Motions to Dismiss, [*see* R. 559-584].

The Trustee cannot avoid the Transfer because it falls within § 546(e)'s safe harbor and the Bankruptcy Court erred in denying BMO's and Sun Capital's Motions to Dismiss.

**IV.**
**CONCLUSION**

Based on the foregoing, the Bankruptcy Court's August 18, 2022 Orders denying BMO's and Sun Capital's Motions to Dismiss are **REVERSED**.  The Request for Oral Argument filed by BMO and Sun Capital is **DENIED**.  [32.]  This case is **REMANDED** to the Bankruptcy Court and the Bankruptcy Court is **DIRECTED** to enter an Order dismissing the Trustee's claims with prejudice and to enter final judgment accordingly.

Date: 5/2/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**